The next case this morning is 20-2054. I'm sorry, 2054, Britton v. Keller. Counsel, please prepare to argue. Counsel, we're ready to hear you. Good morning, judges. This is Blair Dunn on behalf of the appellant Marcy Britton, and may it please the court. I would offer first an acknowledgement to the court that on its face that this may be appear to be a somewhat bizarre case. But I will offer to the court that really what we're dealing with is a fairly run-of-the-mill takings claim brought in light of the recent Supreme Court's decision in Nix v. Township of Scott, Pennsylvania, along the lines that state remedies no longer need be exhausted. And so this is a first post-Nick appeal of a municipal programmer ordinance that acts to inversely condemn a person's private property for the public benefit. And I don't think that that's any different than the majority of the case law that exists and is available to establish that this isn't anything other than that type of a run-of-the-mill case. I would first like to start by discussing where I think the district court first went awry. It's well settled and fairly bright line that when it comes to a takings case, and in this case we haven't even established in the factual record for the court whether it is a physical invasion by the government or it is a regulatory taking, and the reason that... Well I actually had a question on that. What's your argument? You're not arguing that it's a per se taking that she's been completely deprived of all beneficial use of her property, are you? No, that's correct. What we are arguing is that there is a physical instrumentality that the city of Albuquerque really doesn't have a whole lot of control over once they've dumped them. So it would be hard to say that it is this per se taking, but that's not necessarily that something that has yet been established in the case. We do believe that the district court erred by jumping ahead and basically engaging in a consensual balancing analysis before there had been a proper factual development of the record. This was a motion... But counsel, on a motion to dismiss, doesn't the complaint nonetheless still need to allege facts to establish a plausible claim? You seem to be arguing that well we need to take discovery and flesh all this out. Maybe I understand that, but the complaint needs to stand on its own, doesn't it? It does, your honor. So the theory of your complaint is what? Back to Judge McHugh's question, do we have a physical invasion taking alleged here or a regulatory taking? I believe that this is a regulatory taking that arrives from a physical invasion through an instrumentality of the government. So the closest case that I would compare it to is the Arkansas Game and Fish Commission case that we discussed extensively in our briefing. Essentially what you have is a policy in the government that they do not want to kill these cats. And so instead of killing the cats, they take custody or control of them. They may perform vaccinations and spaying and neutering on the animal, and then they take and they dump it. They abandon it out into the open. Our argument is that dumping of the cat that is in the custody and control of the state of New Mexico... I'm sorry, the city of Albuquerque, dumping it out onto the land essentially so that it flows just as water would out onto the property of the plaintiff and then damages the property of the plaintiff is, other than it's water and cats, very akin to the U.S. Supreme Court decision in the Arkansas Game and Fish case. And we do believe that there has been a taking under that analysis from the United States Supreme Court. They have essentially dumped that out there. Whether it fits cleanly into a regulatory taking that's just a deprivation of a value of the property sufficient to do a pen central balancing, or it's an actual physical invasion, those don't fit clearly into this type of a case. It's more akin to the flooding case that we have in Arkansas. The next major point that I will turn to is this idea that somehow because cats have never been used to effectuate the inverse condemnation before, that that's not clearly established. That flies in the face of pretty much all takings law across the country. It's never always quite exactly the same that the government is somehow decided through some sort of nuisance or trespass to do something that interferes with somebody's property. They do it pursuant to their decision as a government entity and a policy decision. The idea that it has to be exactly the same to be clearly established as the courts seem to fall into and has been argued by the police, I think that that was the next big error. To afford qualified immunity to the city of Albuquerque in this instance, again, I don't think... Well, counsel, just to be clear, the qualified immunity part of this case relates to the individual defendants, correct? The district court's decision isn't quite that it's against the individuals because it is a 1983 claim, but I don't think that the district court was... I guess what I was trying to say is that the district court didn't divide it up and say that we didn't clearly establish that these defendants took some sort of action. We actually have quite a bit of allegations, very plausible allegations in the complaint that the individuals were engaged in some activity to take ownership of what has happened to Miss Britton and her property. Well, as far as Mayor Keller and Director Navarez are concerned, the district by not arguing it on appeal? I'm not certain that we waived that argument on appeal, Your Honor. I do believe that we did reference... I'm believing in my opening brief, we do reference that we cite to the complaint as discussing the phone calls between Mayor Keller and the plaintiff and her phone calls to Director Navarez. So we did actually have facts in the complaint and I do believe I did address those in the opening brief. I don't recall that you addressed this specific issue that the district court ruled on, which was the lack of personal involvement. You may have given a recitation in your fact statement, but I don't recall that you ever engaged on that argument. It may not have been as clear as it was in my mind, but I may be in error. I apologize to the court if I am, but I do believe we did discuss that it was and I think it was more in terms of the pleading standards. We argued that we couldn't really establish those facts without some amount of discovery and at this stage in the pleadings again, we had not had the chance to get to that point. We had alleged in the complaint, so I think that what I was referencing is it's more found in the 12b6 discussion in our opening brief that we didn't have the opportunity because we didn't get to the proper place in the pleadings or in the briefing in this case for addressing that on a factual basis. Again, getting to the point that the district court. Council Judge Lucero, it seems to me that your claim here is really against the city for its program. Now is the program pursuant to an ordinance? I'm sorry if that was a question, your honor. It's pursuant. The question is, is the program conducted pursuant to an ordinance? I believe it's conducted pursuant to an administrative instruction or a policy. It is pursuant to direction from the mayor and the city. Yes, but did they adopt an ordinance providing the parameters of the enforcement of the policy? I don't believe they did, your honor. So it's just purely a policy. It's directed by the mayor. Now these employees don't have any discretion in the exercise of the policy, do they, in the implementation of the policy? We're not sure, your honor. That's part of what we don't yet understand and what we couldn't address with the district court without the opportunity to at least engage in some amount of discovery, which we never got to do, to ask, in reality, Mr. Navarez, if he had been afforded that direct discretion or ask the mayor if he'd been affording Mr. Navarez that discretion to do that. We do know that Mr. Navarez was supervised by the mayor and by the chief administrative officer for the city and that ultimately somebody in that food chain did decide that this was the policy and that they were going to implement it and they did in fact carry that out. And it is a carryover. Well, you're not asserting that these in which they are executing what you've described as the policy by virtue of their own discretion, are you? No, your honor. We're alleging that these are individuals that are acting under the color of the policy or the color of the law. All right. So the response to Judge Matheson's question, because I didn't hear an answer to his question, is a qualified immunity doesn't apply to the city itself, does it? No, the qualified immunity applies to the individuals. Thank you. Let me ask you this. If we view this as an exercise of the police powers of the city and we also were to determine that there was a valid justification for the city's action in exercising its police power, would you have a claim? Yes, your honor, if it's a valid exercise of the police powers. And that's where the law, the substantive law in New Mexico turns on that point. And we did point that out to the district court. It's really highlighted, I think, very clearly in our reply brief. We discussed what there's two state statutes that issue that place the city's actions beyond being lawful. One is that they're engaged in and they've taken custody of these animals and then they are dumping them in violation of the state statute that makes that a criminal penalty. And then there's another one where it says that if a person has a animal under their custody or control and they allow that vicious and the legislature actually uses the example of feral cats to be loose and potentially able to harm somebody, that that's also a violation of law. So there's two violations of law. So it cannot be a lawful action by the city to engage in this action. And if the court. Counsel, how do you get around the the Mountain States legal foundation decision? I believe, as we pointed out in our briefing, that that and we've referenced the Colvin case and the Fellini case as an example, we're not necessarily arguing that the animals per se are the of the offending action. And there is a distinction there. You're talking about wild in the custody or control in the Mountain States legal case versus feral cats that are actually held in possession in the hands of the city as at one point. And there's a big distinction between those two. And then the city takes an action to release that animal. And that's that gets to our discussion about the these feral cats are not typically under the law considered wild animals, whereas wild horses and Mountain States legal foundation were very much considered a wild animal. They are considered that by statute. So there's a big distinction between those two cases purely on the type of the color of the horse, as it were in this situation. But would you agree that the loss here, the damage you're claiming is incidental to the exercise of the police power? They picked up these cats in a location. They neutered them and vaccinated them and then dropped them off on the same location. They didn't drop them off on your client's property. And so to the extent some of those cats wander onto the property, isn't that incidental to what the city did? Not in the scope and severity of how it was accomplished. We're talking about establishing cat colonies in some instances with hundreds of cats adjacent to these people's property. It's inevitable that these cats are going to go onto that property and that that person's going to bear the burden for them. So it's not really incidental. It is the same as if you open the floodgates onto somebody's property as they did in the Arkansas game and fish case. If you dump that water out, it's going to go out and harm that person's property. That's inevitable. And if the court doesn't have any immediate questions, I'll reserve the minute and 20 I have left. So done. Good morning, Your Honor. This is Kevin Morrow on behalf of Tim Keller, Danny Navarez, and the city of Albuquerque. Certainly based on the 12B6 that was granted by the district court, the city is of belief that that was properly granted. And we asked this court to affirm the decision of the lower court. We don't believe that Ms. Britton has a colorable argument for a taking, whether it be per se or regulatory, that the city's actions do not infringe on Ms. Britton's enjoyment of her property. The city is not alleged to have physically entered the property or to have restricted what Ms. Britton can do with her property. With Arkansas, we would dispute that. And the factual predicate for that is that a dam was released and water, as we know, flows downhill. It was predictable. It happened repeatedly. And it happened every time that water was released from the dam. That is not the same as releasing feral cats back into the same area where feral cats already existed. As we all know, it is considered quite difficult to herd cats. And so the idea that it is both inevitable and derivative of the city's actions, and that the actions of the cats in walking across Ms. Britton's property is an instrumentality of the city, we believe to be incorrect. Well, Council, isn't this case also different from wild horses and Mountain State's legal foundation in that feral cats in Albuquerque are not naturally occurring wild animals? Well, I would dispute that to some extent. They are not defined by federal act as wild horses and burros as they were in the case you've mentioned. However, feral cats are existing in the community. They exist. They are a problem. They do affect the public safety and welfare, which is to Ms. Britton's point. That is, in fact, the entire existence of this trap, neuter, and release program is to mitigate what we recognize to be a public health issue. The capture of feral cats and the neutering and vaccination of them is directly designed to mitigate a health issue for the population. The New Mexico statute, once you capture them and perform these veterinary services on them, does that change their status so they're no longer wild? It does not. I believe it's under 77-111, which is the state statute regarding a municipality's ability to deal with animals at large. The only provision that is prohibited in that regard is that the city is prohibited from doing anything that would violate statute 77-1B, and the city's institution of this trap, neuter, and release policy is in no way prohibited. In fact, to one of Ms. Britton's arguments, it's implicit by emphasizing that the city has introduced a no-kill program, that the city would be allowed and was previously allowed to operate a euthanasia program. That is actually what is specifically allowed under 77-1B. Certainly, the government can capture and euthanize animals as a means to remedy the public safety, but the people at large would certainly be subject to animal cruelty statutes if they were rounding up cats and then executing on their own property. There is a distinction between what the government has allowed, and I think that's what hinges on the existence of the trap, neuter, and release. Council, whether the feral cats are wild animals or not, the point at which they come into your custody, at that point, they're under the control of the city, correct? I would argue that they're under the temporary control of the city. Well, fine. They're fine. They're in temporary control. Let's not argue about it. The point is they're under some control of the city, and if in fact you're having colonies of as many as 100 cats, yes, this is not some minor problem. This is a major problem in a metropolitan area. The city has to adopt policies that are not going to create the kind of problems that are complained of here. What obligation does the city have, if any? You contend you have none? You can just release them back out into the wild, as it were? Your Honor, actually, we would argue that the existence of the trap, neuter, and release program is designed exactly to fulfill that obligation. Well, it seems to me your policy is to make them live a little longer by protecting them from disease by inoculating them, and then you neuter them so that they can't reproduce, which I don't know how that affects their life cycles one way or another, but it seems to me that that's not doing anything to control the problem. Well, I would contend that it actually does do something to control the problem, and that the ultimate purpose of it is to reduce the community cat population by reducing their proclivity to procreate. In this instance, bringing cats that are already in the existing area and then reducing their ability to procreate and re-releasing them into the same area is directly, to your point, the city's attempt to mitigate this issue. Well, counsel, related to that, if we accept Ms. Britton's allegations in the complaint, it's true that the program causes disease to her family and property damage from defecation and urination amounting to a nuisance. How can the injury here be incidental? Well, what I would argue is that the program doesn't create the issue of feral cats. The cats exist whether the city were to capture them, neuter them, and release them or not. The existence of the program is actually to offset and mitigate the claim damages of Ms. Britton. So its entire intent is to create a healthier community and to be a valid exercise of police power as we endeavor to create that healthier community. So beyond that, I wanted to touch on the issue of qualified immunity. I think the district court was correct in asserting that Ms. Britton did not make any direct allegations of participation by the mayor, Mr. Keller, or by Danny Nevarez, the director of animal welfare. They are not alleged to have personally captured cats, neutered cats, released cats. They're not alleged to have stepped foot on Ms. Britton's property and therefore they certainly are not alleged to have done anything specific that could put them on notice that they would have violated Ms. Britton's constitutional rights. Additionally, Ms. Britton does not cite to anything that would indicate or make them aware that they could be found to have violated Ms. Britton's civil rights. The argument in response is that we couldn't allege it yet because we need discovery. We haven't had an opportunity to find out who did what when. What's your response to that? And I understand that that is the allegation. I would say that to your point, I don't believe Ms. Britton alleged much in the brief to deliver anything with specificity. Additionally, even at the various level, making a few phone calls to Ms. Britton, I don't believe rises to any kind of constitutional duty or the potential that they violated any of Ms. Britton's rights. Also, as we talked to, I think it's important to realize that the city's program does not affect or prohibit Ms. Britton from any particular actions. As has been mentioned is the Fellini case, where it was mentioned that you cannot charge the horses with a violation of the rights. However, what was really found was that the government actions prohibited the Fellinis from, quote, shooing away the horses. Ms. Britton is not prohibited in any way from building a fence, getting a dog, shooing away cats, anything whatsoever. The government has not prohibited anything that related to her individual actions and therefore have not violated her constitutional rights. So I don't believe that the Fellini case is applicable in this matter because I think ultimately the instrumentality that is alleged to the cats themselves, which the Fellini case said was not something that you could fixate on. So ultimately, I think I'd really just like to emphasize that the district court made an appropriate decision that the motion was well founded and well heard and that we agreed entirely with the district court's order. And I stand for further questions, but I think that otherwise I would give the rest of my time. Well, are there any questions? I hear none. Then we accept the seating of your remaining time. We're ready to hear from your colleague. Thank you, Your Honor. Very briefly, I think it bears touching on the questions that Your Honor asked about what could or should the city be doing. And that does get to the point that they had a policy in place that was in line with their statutorily charged duties to control the running of animals at large within the city limits. They're given that police power for a reason, and there's a responsibility that comes with it. Now, they have said that in their attempting to mitigate the nuisance population of these cats by doing the vaccinations and the sterilizations. But the problem is that the way that they used to handle this was euthanasia. And that did handle the problem, and it did eliminate the nuisance issue in a permanent fashion. They enacted a policy to say we are no longer going to euthanize feral cats that come into the custody of the city of Albuquerque. That policy then turned around and placed the burden of supporting these cats, even after they've been vaccinated and sterilized, on the communities in which these colonies of cats are dumped and therefore established. Does it matter if the cats were there before they were picked up to be sterilized? I don't think it does. I think what's more important is the fact that the city takes custody of control, and then they take and they go out and they abandon these animals without providing everything necessary for the animal to survive. And they place the burden on the community to house and to feed these cats. Otherwise, people have to watch. And that's a fairly inhumane way to handle an animal. You just dump it out there and hope that it makes it. It subjects them to being run over. It subjects them to depredation of other protected species under the Endangered Species Act. They starve to death. All kinds of horrible things happen to these animals. And that's part of the problem here, is that you're forcing the community to witness all these unpleasant things or come out of their pocket to build their own fences, as was said, to keep the city's problem off of their property. And it's pursuant to the city's policy that this happened. And that's why it's a taking. And my time has expired. If there are no further questions, I appreciate the courtesy and the time of the court today. Thank you, counsel. The case is submitted. Counsel are excused.